AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
District of Montana

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>IN THE MATTER OF THE SEARCH OF ONE GRAY<br>COLORED IPHONE IN A WHITE CASE FOUND IN THE<br>POSSESSION OF LINGWEI YANG | )<br>)<br>)<br>)<br>)<br>) | Case No.  MJ-26-33-M-KLD |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, which is incorporated herein by reference.

located in the _____ District of _____ MONTANA _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B for a list of items to be searched for and seized, which is incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |
| 18 U.S.C. § 1343, 2 | Wire Fraud |

The application is based on these facts:

The accompanying affidavit is incorporated as if fully restated herein.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Shawn Schrader, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Feb 23, 2026

City and state: Missoula, Montana

_____
*Judge's signature*

Hon. Kathleen L. DeSoto, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE GRAY COLORED IPHONE IN A WHITE CASE FOUND IN THE POSSESSION OF LINGWEI YANG | MJ-26-33-M-KLD |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Shaun Schrader, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant pursuant to Federal Rule of Criminal Procedure 41.  This affidavit supports an application for a search and seizure of the following (hereinafter "the device"):

**One gray iPhone in a white case found in the possession of Lingwei Yang**

2.      The device was seized from Língwei Yang (hereinafter "Yang") on February 20, 2026, pursuant to a probable cause arrest.  This applied for warrant would authorize the forensic examination of the device identified in Attachment A, for the purpose of identifying electronically stored data particularly described in Attachment B.

3.      I am a Special Agent with the FBI and have served in this capacity since 2011. I am assigned to the Salt Lake City Field Office, Missoula, Montana Resident Agency. My current assignment includes the investigation of complex financial crime matters. Prior to my employment with the FBI, I was a Special Agent with the Internal Revenue Service – Criminal Investigation Division for six years. I am also a Certified Fraud Examiner.

4.      As a Special Agent, I have received training in various aspects of criminal investigations dealing with criminal law, criminal tax law, money laundering, search, seizure, forfeiture, and various financial investigative techniques. I have attended continuing educational classes and seminars in various aspects of criminal investigation, dealing specifically with asset seizure and forfeiture, financial investigative techniques, and international financial fraud. My experience includes investigations of individuals, partnerships, and corporations. Many of these investigations involved illegal activities, such as mail or wire fraud, investment schemes, embezzlement, theft, currency reporting violations, narcotics trafficking, money laundering, and tax evasion.

5.      I have been involved in the execution of numerous federal search warrants, which resulted in the seizure of hard copy and electronic evidence, including financial records, tax returns, bank records, accounting records, correspondence, and other documentation related to criminal activity.

2

6.    I have been involved in the execution of numerous federal seizure warrants, which resulted in the seizure of assets, including cash, vehicles, jewelry, and real property purchased with money traceable to proceeds of fraud and narcotic-related crimes.

7.    The facts in this affidavit come from my investigation, personal observations, my training and experience, and information obtained from other law enforcement officers, witnesses, and informants.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.    Through my experience and training I am aware that perpetrators of financial fraud schemes utilize electronic devices to communicate with co-conspirators and past and current victims of their schemes. The perpetrators of these financial fraud schemes also utilize electronic messages such as email, messaging platforms, and text messages to promote their schemes in an effort to entice and attract new victims to the scheme.

9.    Based on my training and experience, and the facts as set forth in this affidavit, I submit there is probable cause to believe that the device contains evidence of violations of 18 U.S.C. §§ 1343 & 1349 (wire fraud and conspiracy to commit wire fraud).

3

## PROBABLE CAUSE

10.    The information below is presented to show that Yang and other unidentified co-conspirators were involved in the theft of $15,000.00 in U.S. currency and forty-one ounces of gold (with a value of approximately $205,000.00) from a 77-year-old victim named John Doe.[1]   John was influenced by subjects he was communicating with by telephone to part with his money, in violation of 18 U.S.C. § 1343, and evidence of this criminal activity is likely to be found within the device.  Evidence corroborating these allegations includes witness interviews, surveillance, and monitored phone calls.

11.    On February 3, 2026, John Doe, whose identity is known to law enforcement but protected here, contacted the Missoula County Sheriff's Office to report he believed he was the victim of fraud.  John provided a brief statement to the responding deputy.  Due to the significant reported loss amount, the case was assigned to Missoula County Sheriff's Office Detective Mike Sullivan.  Detective Sullivan conducted an in-depth interview with John on February 10th, 2026.

12.    John advised that on around January 24, 2026, he had been having issues logging into his online checking account through Zions Bank.  He had

---

[1] The name and identity of the victim is known to the agent, but the name is replaced with John Doe to protect the privacy of the victim.

4

submitted a work ticket to get help from the bank to resolve the issue. Within a few days of submitting the work ticket he received a telephone call on his home's landline. The person calling identified himself as "Steven", a fraud investigator with Zions Bank. John reported that Steven spoke with what sounded to be a foreign accent. Steven informed John funds were being fraudulently transferred from his account to an account in China and that they were concerned the transfers could be illegal. Steven told John it appeared approximately $303,000.00 had been sent from his account. Steven advised he was working with the Federal Trade Commission (FTC) to investigate the illegal activity and have it stopped.

13.    Steven informed John the only way he could resolve the issue was to take the same amount of assets and turn them over to the FTC to be "legitimized." John was told the FTC would need to keep the assets for approximately one week to complete the process, and then the funds would be returned to him.

14.    Steven asked John what assets he had available to turn over to the FTC so that they could be legitimized. John told Steven he had gold coins and approximately $15,000.00 in emergency cash reserves that he had been accumulating over the last several years. John was told he would need to submit at least forty-one ounces of gold and $15,000.00 in cash to cover the amount. John advised Steven he did have the cash and gold to submit to the FTC. John was

5

willing to provide the cash and gold to regain any money he had lost or that had been sent to China.

15.     Your affiant notes that currently gold is priced at around $5,000.00 per ounce; therefore, the forty-one ounces of gold would be valued at around $205,000.00.

16.     Steven told John he would send a courier from the FTC to his residence to collect the cash and gold from him. John was given very specific directions on how to separate and package the gold. John advised the gold was packaged into five separate Wal-Mart disposable bags. John was told to place the cash into a sixth Wal-Mart bag.

17.     Steven wanted pictures of the packaged gold, along with a picture of John's driver's license and an example of his printed name and signature. John sent the pictures as requested.

18.     Prior to the packages being picked up, the phone calls with Steven continued. Steven became controlling and demanding on the phone. John was instructed to tell no one what was going on. Steven would call John multiple times per day, sometimes up to fifteen times per day, to make sure he was complying with the instructions he was given. When John was on the phone with Steven, he was not allowed to hang up the phone at any time. Steven was the only one allowed to end the calls. There was even an instance where John needed to use the

bathroom and Steven told him to bring the phone to the bathroom with him. John advised there were red flags along the way, but he just wanted to comply and clear his name.

19.    After a few days, and after John had collected and packaged the cash and gold, Steven told him he would send the courier from the FTC to collect the assets. Steven told John the FTC would retain the cash and gold for approximately one week while it was being inspected. After that week, the assets would be returned to him. On the morning of January 31, 2026, Steven told John the courier would be coming to his home that afternoon. Steven wanted to know what clothing John was wearing that day so the courier would be aware of who was approaching him when he arrived.

20.    At approximately 3:30 p.m., Steven called John and told him the courier was parked outside his home in a white SUV. John was told he needed to stay on the phone with Steven during the entire transaction. John was provided with a code of "Magic123" and was told he needed to carry the first package out to the courier. Once John got to the courier's vehicle, the driver needed to repeat the same code to him before he could place the package in the vehicle.

21.    John described the driver as a male wearing a hat. The driver was on his cellular phone during the entire transaction. The driver rolled down his window and told John his name was David and that his code was Magic123.

7

Steven then asked John if the driver's code was the same as his, which it was. John was then told to place the packages on the back seat of the vehicle. John proceeded to load all six bags onto the back seat of the vehicle. After loading all of the bags into the vehicle, the courier drove away.

22.    After several days, John began to realize he likely had been scammed and decided to call the Missoula County Sheriff's Office on February 3, 2026.

23.    After parting with his cash and gold, John continued to receive phone calls from Steven. Due to believing he had been scammed, John did not answer any of the phone calls.

24.    After providing his statement to law enforcement, John was asked if he would be willing to recontact Steven and tell him he had additional gold in order to entice a courier to his home to pick up the additional gold. John agreed to assist law enforcement with this endeavor.

25.    On February 13, 2026, John placed a phone call to Steven. Steven answered the call and questioned why John had not been answering his calls. Steven advised he had been very sick and had not been taking any calls. John then asked Steven about the status of the return of his cash and gold. After multiple calls and conversations, Steven advised he would be receiving his $15,000.00 in cash and forty-one ounces of gold, in addition to a $303,000.00 cashier's check soon.

26. John advised Steven he had an additional eighteen ounces of gold. Steven requested pictures of the gold from John. Law enforcement provided John with ruse pictures of eighteen one-ounce gold coins that John sent to Steven. Steven told John to place the gold in a sealed box. A picture of a rouse box was sent to Steven. Again, after multiple phone calls on February 19, 2026, and February 20, 2026, Steven advised he would be sending a courier to John's house on February 20, 2026 to pick up the gold. Steven provided John with a security code of "security", which was to be exchanged with the courier. Steven also advised the courier would be providing John with a one-dollar bill that John was supposed to retain.

27. On February 20, 2026, while on the phone with Steven, John was advised that the courier was outside of his home. John was told to exit his house with the box of gold and meet the courier. John exited his home and did not see the courier's vehicle. John was told the courier was there and that he needed to wait for him outside. After some time, the courier arrived on foot to meet with John. After the security word was exchanged, John provided the box to the courier, and the courier provided John with a one-dollar bill. The courier then departed on foot.

28. It should be noted that during the previous pick up, John took a picture of the courier's vehicle with his phone. The courier saw that John took the

9

picture. After John provided the cash and gold to the courier, Steven asked if John

had taken a picture of the vehicle. John acknowledged that he had taken a picture.

Steven told John the picture would need to be deleted, and he directed John on how

to let him "remote in" to his home computer. Steven was able to access the

computer's camera. Steven then directed John to place the phone where he could

see it and then watched as he had John delete the picture.

29.    Your affiant believes the courier arrived on foot as a security measure

in case John attempted to take another picture of the vehicle.

30.    Prior to the pick-up, law enforcement surveilled John's home in

anticipation of the courier arriving. A black Chrysler Pacifica, with an Idaho

license plate, was detected in the vicinity of John's home prior to the pick-up. The

vehicle was determined to be a rental. The vehicle was observed by the

surveillance team to be conducting what appeared to be counter-surveillance

around John's neighborhood before parking the vehicle down the road, exiting the

vehicle, and approaching John on foot.

31.    After receiving the box from John, the courier walked back to his

vehicle and then departed the neighborhood. The surveillance team observed the

courier using his cell phone after departing.

32.    The surveillance team followed the vehicle until it finally stopped in

downtown Missoula, Montana. After stopping, the driver of the vehicle was

contacted by law enforcement and arrested.  The driver was found to have a cell
phone in his possession, which was seized by law enforcement.

33.    The driver was identified through the California driver's license in his
possession as Lingwei Yang.  Yang also later identified himself to your affiant as
Lingwei Yang.

34.    Law enforcement was able to determine Yang arrived at the Missoula
airport on February 20, 2026, via a Delta connecting flight from Salt Lake City and
that he had a return flight scheduled the same evening.  Law enforcement was also
able to determine Yang rented a vehicle from Hertz Rental Car on February 20,
2026.

35.    Yang was transported to the Missoula FBI Resident Agency where he
requested an attorney before answering any questions.

36.    Your affiant monitored multiple phone calls between John and Steven.
During the phone calls, your affiant observed the fact that Steven spoke with what
sounded to be an Indian accent.  Based on my knowledge and experience, your
affiant knows that scams similar to this one often originate with operators located
in India.

37.    Based on the above information, I submit Yang conspired with others
to travel to Montana and defraud John, in violation of 18 U.S.C. §§ 1343 & 1349

11

(wire fraud and conspiracy to commit wire fraud).  I submit evidence of these violations will be found in the device.   I base this on the following:

a.   Based on my training and experience, criminals involved in setting up a meeting with a victim to pick up cash, as shown in the affidavit, will utilize telephone and messaging applications with each other.  Those communications constitute interstate and/or international wires.

b.  Based on my training and experience, cellular devices often keep a historical log of GPS locations.  This historical log can be used to track a subject's path of travel and link them to a particular event, in this case the meeting with John at his home, and potentially meetings with other victims.

c.  Based on my training and experience, I know that fraud schemes that abuse the elderly will immediately transport the money out of state to avoid detection and ensure the victim cannot recoup the funds.

d.  Based on my training and experience, perpetrators of fraud schemes will discuss the disposition of fraudulently obtained proceeds.

12

## TECHNICAL TERMS

38.    Based on my training and experience, I use the following technical terms to convey the following meanings:  Wireless Telephone, cellular phone, or smartphone:  A wireless telephone (or smartphone, mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet using a browser or other applications.  Wireless telephones may also include global positioning system ("GPS") technology for determining location of the device.

13

39.     Based on my training, experience, and research, I know that the device has capabilities that allows it to serve as wireless telephones or smartphones, digital cameras, portable media players, GPS navigation devices, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

40.     Based on my knowledge, training and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensic tools even if the information is deleted.

41.     Forensic evidence. As further described in Attachment B, this application seeks permission to locate, not only electronically stored information that might serve as direct evidence of crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic evidence might be on the device because:

14

a.      Data on storage medium can provide evidence of a file that was once on the storage medium, but has since been deleted or edited, or of a deleted portion of a file.

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

15

e.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## **CONCLUSION**

42.    Based on the forgoing, I request that the Court issue the proposed search warrant. I believe there is probable cause to conclude that the device, a gray iPhone with a white case, which was seized from Yang during the investigation, and known to be utilized by Yang, contains evidence showing he was working with "Steven" and other unidentified co-conspirators to fraudulently steal money from John and possibly others.

43.    It is my belief that there is probable cause to believe that a search of the items described in Attachment A will provide other evidence of crimes, including, but not limited to, fraudulent misstatements, the falsification of documents, the disposition of fraudulently obtained funds, and discussions between co-conspirators regarding travel plans to Montana, and other states, to illegally obtain cash from victims through fraudulent means.

Respectfully submitted,

Shaun Schrader
Special Agent
Federal Bureau of Investigation

16

SWORN to before me and SIGNED in my presence

Kathleen L. DeSoto
United States Magistrate Judge

## <u>ATTACHMENT A</u>

### Property to Be Searched

One gray iPhone with a white case found in the possession of Lingwei Yang.

## ATTACHMENT B

### Particular Things to be Seized

1.    Digital or electronic evidence of a crime, contraband or fruits of a crime, in violation of 18 U.S.C. §§ 1343, 1349 (wire fraud and conspiracy to commit wire fraud) including the following:

    a.  Text messages, Email, messaging applications, phone messages, and other correspondence, to include any social media application (i.e. WhatsApp, SnapChat, Instagram, etc.), together with associated metadata, that reference or pertain to fraud, conspiracy, and impersonating a federal agent.

    b.  Photographs, video, or voice recordings, together with associated metadata, depicting the individual or co-conspirators or financial crimes, U.S. currency and precious metals;

    c.  Information indicating websites accessed by the cellular telephone, together with associated metadata, referencing or pertaining to maps, travel directions, hotels and motels, and car rental companies;

    d.  GPS data for trips or travel;

e. Contact lists, address lists and phone lists, together with associated metadata;

f. Any and all logs or lists, together with associated metadata, showing incoming calls, outgoing calls, missed calls, and dialed numbers;

g. Fraud payments or records of defrauding victims of money, in whatever form, including applications;

h. Information pertaining to the use and disposition of fraudulently obtained funds;

i. Information that identifies the user of the smart phone, cell phone, or electronic device.